UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOSHUA LUCKEY                                    CIVIL ACTION

VERSUS                                           NO. 21-1895

TRAVIS DAY                                       SECTION "A"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing § 2254 Cases. Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.[1] For the following reasons, I recommend that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE** as time-barred.

## I.    FACTUAL BACKGROUND

Petitioner Joshua Luckey is a convicted inmate incarcerated in the Rayburn Correctional Center in Angie, Louisiana.[2] Luckey was charged by a bill of information in Jefferson Parish with two counts of sexual battery upon a known juvenile under the age of thirteen in violation of La. Rev. Stat. § 14:43.1.[3] Luckey pled not guilty on April 5, 2013.[4] The Louisiana Fifth Circuit Court of Appeal summarized the established facts as follows:

---

[1] A district court may hold an evidentiary hearing only when the petitioner shows either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence (*id*. § 2254(e)(2)(A)(ii)) *and* the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. *Id*. § 2254(e)(2)(B).

[2] ECF No. 1, at 1.

[3] State Record Volume (hereinafter "St. R. Vol.") 1 of 10, at 38, Bill of Information, 4/3/13.

[4] *Id.* at 13, Min. Entry, 4/5/13.

After meeting on a dating website, the victims' mother, B.B., and defendant became romantically involved in November 2011. According to B.B., who identified defendant in open court, the couple had plans to marry. In December 2011, defendant moved into B.B.'s aunt's house in Marrero with B.B. and her children, L.D., E.D., A.B., and A.W. They then moved to another home in Marrero where they lived for approximately six months. Thereafter, defendant, B.B, and the children moved into a two-bedroom apartment on Barataria Boulevard. In this apartment, all of the children slept in one room on the opposite side of the apartment from the bedroom in which B.B. and defendant slept. The kitchen and the bathroom separated the two bedrooms.

Although B.B. acknowledged that defendant could be harsh with the children in terms of discipline, B.B. testified that the children loved him and that he would babysit them when she had something to do. She denied ever seeing defendant abuse the children, and she never observed any strange behavior that might suggest any issues with defendant and her children. B.B. testified that, in the weeks leading up to the day when the allegations came to light, she felt like defendant was hiding something from her and maybe was cheating on her.

According to B.B., on February 3, 2013, at about 7:30 a.m., she woke up, went into the kitchen of the Barataria Boulevard apartment, and saw defendant putting frozen fruit in a cup for her oldest daughter, E.D., who was seven years old at the time. When B.B. asked defendant "what was [E.D.] getting that for," defendant responded that E.D. "had cleaned up the dog's mess on the floor." B.B. testified that, at the time, she thought nothing of it. Later that morning, as she cooked breakfast, her oldest son, L.D., helped her with the dishes. According to B.B., L.D. commented to her that "[E.D.] was a lucky bird because she always got all the hugs and kisses." B.B. testified, "[T]hat set an alarm off in my head." B.B. then approached E.D. to ask her if anything was wrong: "[S]he told me that Josh had been coming in her room at night and that she wasn't getting any sleep and that he had been touching her. So I grabbed her by the arm, and I went into the room. And I grabbed my cell phone, and I dialed 911."

Among the police officers who responded to B.B.'s call was Deputy Thelma Hill. Deputy Hill testified that, after speaking with B.B. who reported that E.D. told her "that Josh comes into their room at night and talks and feels on her," she spoke with E.D., who explained to her that "Josh comes in her room at night when she's asleep and touches her on her vagina and sometimes places his finger in there." E.D. told Deputy Hill that the last time defendant came into her room was the previous night and that defendant agreed to give her a frozen treat if she agreed to hug him. E.D. explained to Deputy Hill that she complied but that defendant did not want to let her go when she wanted to leave. Deputy Hill testified that she also spoke with B.B.'s son, L.D., who told her that defendant comes into the children's bedroom at night "all the time" and talks "very low" to E.D. When Deputy Hill asked E.D. whether she had ever seen defendant's private area, E.D. responded affirmatively, adding that "he shows it to her all the time." E.D. reported to Deputy

Hill that defendant has "some types of scars or designs on [his penis]." Thereafter, Deputy Hill confirmed with B.B. that defendant has "some type of implants or something on his penis."

Detective Ronald David Ray, Jr., the lead investigator in this matter, also testified that E.D. reported to him at the scene that "Joshie had been touching her in what she termed her tu-tu." When Detective Ray asked E.D. to explain "tu-tu," E.D. pointed to her vaginal area. Detective Ray testified that E.D. also confirmed her statement about "the bumps" on defendant's genitalia. Based on E.D.'s statement concerning unusual bumps or scarring on defendant's penis, Detective Ray obtained a search warrant to take photographs of defendant's person. Detective Ray testified that the photographs—which were admitted into evidence and published to the jury—reveal bumps on defendant's penis in the shapes of a heart and a diamond.

At the scene, Detective Ray also interviewed E.D.'s older brother, L.D., who likewise confirmed that he would see defendant come into the children's room at night and give E.D. lots of hugs. At the Detective Bureau, Detective Ray also spoke with defendant who denied any inappropriate touching but "did say that there may have been some inadvertent contact during playtime." Although defendant maintained to Detective Ray that he gave E.D. the treat "because she had cleaned up some dog feces," defendant also made the statement that he told B.B, "[B]elieve your daughter." In her testimony, B.B. confirmed that defendant made this statement to her: "I don't understand why he told me believe my daughter, but he did tell me believe my daughter."

The day after B.B. learned of E.D.'s allegations she felt compelled to ask her younger daughter, A.B., who was four years old at the time, whether "anything bad had ever happened to her, if anybody had touched her anywhere they wasn't [sic] supposed to." According to B.B., A.B. "kind of like put her head down and told [B.B.] that Joshie did—Joshua, they called him Joshie at the time—that he did when [B.B.] was in the shower."

Approximately two weeks later, on February 18, 2013, Dr. Jamie Jackson, a pediatrician with the Audrey Hepburn Care Center at Children's Hospital, performed a sexual assault examination of E.D., which included an incident history. During this examination, E.D. explained, "He gave me frozen fruit for it." When asked what "it" was, E.D. responded,

> Uh never mind, I forgot because when, when my brother [L.D.] he flipped me over it hurt [sic]. And it hurt my brain .... Because the reason why I can't remember lots of things when [L.D.] flipped, flipped me over on, from the skateboard it hurt half, parts of my brain and I can't really remember stuff. *It crunched up some a [sic] my file cabinets in here.*

Nevertheless, the transcript from this examination reflects E.D. then explained to Dr. Jackson that defendant comes into hers and her siblings' bedroom while everyone is sleeping: "He touches me and then I wake up, I go, I wake up and then I fall back asleep, and stay sleeping, and [sic] never comes back in there." After E.D. referred to the place where defendant touched as her "too too," she explained to Dr. Jackson that "too too" refers to her vaginal area: "He kept on digging his finger and li [sic], licking his fingers and digging it in there .... He like pulls down my pants, and then he pulls down my panties and touches [with his finger]." E.D. further explained that she would later experience pain when she tried to use the bathroom: "And then I wake up to use the bathroom, it burned so bad and I had to tell my mom, cause I can't stand it. When he does that." E.D. told Dr. Jackson that defendant did this to her "[m]ore, more than one time." E.D. also described to Dr. Jackson how, more than once, defendant tried to make her touch his "bird" with her hand: "Like every time that he ma [sic], tried to make me do it, I tried to scream out to my mom, but he kept on doing that, and I, and I couldn't talk .... [H]e was closing up my mouth so I couldn't scream to my mom while she was sleeping." When Dr. Jackson asked E.D. whether there was "anything that you noticed or saw like on his bird," E.D. replied, "Like you know how wires look? .... It looks like he has wires inside his bird skin. Like four layers of it .... Like you know how wires are so fat? That's how fat little lines on him [sic]." E.D. reported to Dr. Jackson that defendant told her, "[I]t's a secret between us and you may never tell." In accordance with the State's motion in limine pursuant to La. C.E. Art. 412, the State presented and the district court admitted a redacted version of the transcript and of the audio of this examination and incident history, which removed only references to unrelated past sexual abuse allegations E.D. made against a family member in another jurisdiction.

On March 1, 2013, Dr. Jackson also performed a sexual assault examination on E.D.'s younger sister, A.B. The State introduced the transcript and audio of this examination and published it to the jury. In her incident history, A.B. told Dr. Jackson that defendant is in jail because he touched her on her "tutu" with his hand. A.B. identified her "tutu" as being between her legs. A.B. explained it hurt when defendant did this, but she did not want to elaborate any further for Dr. Jackson.

At trial, the district court accepted Dr. Jackson as an expert in the field of child abuse pediatrics and delayed disclosure. Although Dr. Jackson testified that neither E.D. nor A.B. showed any definitive physical signs of abuse, Dr. Jackson opined that both E.D. and A.B. delayed disclosure of their sexual abuse, which is common in child victims of sexual abuse, and that E.D.'s and A.B.'s interviews and incident histories were consistent with those of children who have been sexually abused. Dr. Jackson explained that it is not uncommon for a young female child not to show physical signs of abuse, even after they reported penile-vaginal penetration by a full-grown male. Dr. Jackson pointed to a study in which only about six percent of girls around the age of seven who reported penile-vaginal or penile-anal penetration had specific findings of penetration. In her experience examining children, Dr. Jackson estimated that ninety to ninety-five percent of the

children the Audrey Hepburn Care Center sees have normal or non-specific findings when they give a history of sexual abuse or penetration.

Around the same time, in late February 2013, E.D. and A.B. received evaluations at the Jefferson Children's Advocacy Center. The State admitted videos of both of these interviews and published them to the jury. During this interview, E.D. told the interviewer that she did not remember why she had come that day, explaining that, during an incident on a skateboard, she "damaged up her brain a lot" where the bad memories were. A.B., on the other hand, testified that defendant touched the skin on her "tutu" and stuck his finger inside of it. Gesturing toward her genitalia, A.B. explained that defendant made her "tutu" hurt.

E.D. and A.B. also testified in person at trial. According to E.D., who was nine years old at the time of trial, defendant touched her "where she was not supposed to" and "in [her] private area" about four times, in her top bunk while her brother, L.D., and two sisters, A.B. and A.W., slept in the room with her. E.D. also testified concerning the distinctive markings on defendant's penis, describing that defendant's "weird thing" or "private part" had "little—like circles of wire on it." However, when asked to identify defendant in the court room, E.D. explained, "Now I don't see him. I forgot where I saw him at .... I don't see him." E.D. recounted that defendant touched her on her clothes and on her "tu-tu" but, when asked, she stated she did not know if defendant stuck his finger inside of her. A.B., who was six years old at the time of trial, testified that she does not like defendant because "he did something bad to [her, E.D., and L.D.]." When asked what defendant did to them, A.B. responded that he "touched like our private parts." Although she testified that defendant touched underneath her clothes, A.B. denied that he put something inside of her. A.B. maintained that this occurred one time when she was four years old and that defendant touched her between her legs while she was in her mom's and defendant's bedroom. Like E.D., A.B. also could not identify defendant in court but testified she was four years old the last time she saw him.

After the State rested, defendant testified that he never touched E.D. and A.B. inappropriately. Although defendant admitted that he had implants inserted in his penis to "pleasure" females, he denied every [sic] exposing himself to E.D. Rather, he argued that E.D. must know about the implants from her mother, B.B., to whom he had sent naked pictures prior to moving in with her.

Defendant also recalled B.B. to the stand to question her about the extent of her contact with defendant following his arrest. Although initially B.B. denied speaking to defendant in any way—"[n]ot by phone, not by letter, no"—B.B. eventually admitted that she wrote a letter, dated August 31, 2013, to defendant that she mailed through his mother. Thereafter, B.B. vigorously asserted that this was the only letter she had ever written defendant. Defendant then introduced a second letter from January 8, 2014, in which B.B. failed to reference the sexual abuse charges and wrote, "I want our family back but you have to prove to me no other

bitches! I hope you can forgive me! I never wanted none of this!" Although B.B. testified she initially did not remember writing the letter, she identified the handwriting as her own and recalled writing the letter as she read it.

On rebuttal, the State offered the testimony of Arturio Rodriguez, who testified remotely via WebEx, a program for transmitting two-way live video. Mr. Rodriguez, an inmate at David Wade Correctional Center serving a forty-year sentence for two counts of forcible rape and convictions for carnal knowledge of a juvenile and aggravated burglary, initially testified that he told his lawyer that defendant had fabricated the January 8, 2014 letter to make it appear like it had come from B.B. On cross-examination, however, Mr. Rodriguez admitted that he was lying when he gave this information to the district attorney because he had hoped to get a more favorable plea deal.[5]

Luckey went to trial, and was found guilty of both counts on November 14, 2014.[6] On February 9, 2015, the trial court sentenced Luckey to twenty-five (25) years at hard labor as to each count to be served consecutively.[7]

Luckey filed a timely, counseled notice of appeal on March 6, 2015, but failed to attach an order.[8] After the Louisiana Fifth Circuit granted Luckey's *pro se* writ application and instructed the trial court to enter an order granting him an appeal, on January 28, 2016, Luckey's motion for appeal was granted.[9] On appeal, Luckey's appointed counsel asserted that the State violated Luckey's Sixth Amendment right to confrontation and a public trial when it presented the testimony of rebuttal witness, Arturio Rodriguez, via Skype (also referred to as WebEx), a video program for transmitting two-way live video.[10] Luckey filed a pro se supplemental brief in which

---

[5] *State v. Luckey*, 212 So. 3d 1220, 1224-28 (La. App. 5th Cir. 2/8/17); St. R. Vol. 8 of 10, at 1941-48, 5th Cir. Opinion, 16-KA-494, 2/8/17.

[6] St. R. Vol. 1 of 10, at 30-31, Trial Mins., 11/10/14; *id. at* 32-33, Trial Mins., 11/12/14; *id. at* 34-35, Trial Mins., 11/13/14; *id. at* 36, Trial Mins., 11/14/14; *id. at* 100, Verdict, 11/14/14; St. R. Vol. 2 of 10, at 277-493, Trial Tr., 11/12/14; *id. at* 494-549, Trial Tr., 11/13/14; St. R. Vol. 3 of 10, at 550-662, Trial Tr. (con't), 11/13/14; *id. at* 663-716, Trial Tr., 11/14/14.

[7] St. R. Vol. 1 of 10, at 101, Sentencing Mins., 2/9/15; *id. at* 102, Commitment Order, 2/9/15; St. R. Vol. 3 of 10, at 717-25, Sentencing Tr., 2/9/15.

[8] St. R. Vol. 1 of 10, at 136, Notice of Appeal, 3/6/15.

[9] *Id.* at 137-38, 5th Cir. Order, 16-KH-33, 1/20/16; *id. at* 139, Order, 1/28/16; St. R. Vol 6 of 10, at 1620-25, La. 5th Cir. Writ Application, 16-KH-33, 1/20/16.

[10] St. R. Vol. 8 of 10, at 1904-24, Appellate Brief, 16-KA-0494, 9/29/16.

he asserted three assignments of error, including two assignments of error not included in his counsel-filed appeal: (1) he was denied the rights to confrontation and due process when the trial court permitted the State to present the testimony of the child victims without a competency hearing; (2) the trial court's admission of the redacted tape and transcripts of E.D.'s interview at the Audrey Hepburn Care Center violated La. Rev. Stat. § 15:440.5(A)(3), as well as Luckey's rights to due process, confrontation, and to present a complete defense; and (3) his rights to confrontation and a public trial were violated when Rodriguez testified via Skype/WebEx video.[11]

On February 8, 2017, the Louisiana Fifth Circuit affirmed Luckey's convictions and sentences, but remanded the case for correction of the commitment order to reflect that his consecutive sentences are to be served at hard labor without benefit of parole, probation, or suspension of sentence.[12]   The court found that, while permitting Rodriguez to testify via WebEx violated Luckey's right to confrontation, the harmless error was unattributable to the guilty verdicts.[13]   The court held that Luckey's claim that Rodriguez's WebEx testimony violated his right to a public trial was not preserved for appellate review as there was no contemporaneous objection under LA. CODE CRIM. PROC. art. 841(A).[14]   The court found the absence of a contemporaneous objection waived his right to review whether the victims' testimony violated Luckey's rights to due process and confrontation, but held that the trial court did not abuse its discretion in finding that the victims were competent to testify as witnesses.[15]   The court further found that the trial court did not abuse its discretion in admitting the redacted audiotape and

---

[11] St. R. Vol. 8 of 10, at 1962-81, Supplemental Appeal Brief, 16-KA-0494, 11/23/16.

[12] *State v. Luckey*, 212 So. 3d 1220 (La. App. 5th Cir. 2/8/17); St. R. Vol. 8 of 10, at 1938-60, 5th Cir. Opinion, 16-KA-494, 2/8/17.

[13] *Id. at* 1228-30; St. R. Vol. 8 of 10, at 1948-52, 5th Cir. Opinion, 16-KA-494, 2/8/17.

[14] *Id. at* 1230-31; St. R. Vol. 8 of 10, at 1952-53, 5th Cir. Opinion, 16-KA-494, 2/8/17.

[15] *Id. at* 1231-32; St. R. Vol. 8 of 10, at 1953-55, 5th Cir. Opinion, 16-KA-494, 2/8/17.

transcript of E.D.'s interview.[16]  The court, however, found that, because defense counsel did not object to the admission of the redacted audio and transcript of E.D.'s interview as a violation of due process or confrontation, review of those alleged errors were waived.[17]

On February 10, 2017, the trial court corrected the commitment order as directed by the Louisiana Fifth Circuit.[18]

Both Luckey's counsel and Luckey filed writ applications with the Louisiana Supreme Court.[19]  On October 27, 2017, the Louisiana Supreme Court denied those related writ applications without reasons.[20]

On August 13, 2018, Luckey filed a *pro se* application for post-conviction relief asserting four claims:[21]

> (1) his rights to confrontation and due process were violated when the trial court allowed the victims to testify without a competency hearing;
>
> (2) admission of the redacted audio and transcript of the interview of E.D. and prohibition on cross-examination regarding prior false allegation of abuse against an uncle violated his rights to confrontation, present a defense, and due process;
>
> (3) ineffective assistance of counsel for failure to: (a) request a competency hearing be held outside the presence of the jury; (b) object to the victims' testimony on constitutional grounds; (c) object to the redaction of E.D.'s interview on constitutional grounds; (d) object to his sentence as constitutionally excessive; and (e) advise him that it was in his best interest to accept the five-year plea offer by the State;

---

[16] *Id. at* 1232-33; St. R. Vol. 8 of 10, at 1955-57, 5th Cir. Opinion, 16-KA-494, 2/8/17.

[17] *Id. at* 1232; St. R. Vol. 8 of 10, at 1956, 5th Cir. Opinion, 16-KA-494, 2/8/17

[18] St. R. Vol. 5 of 10, at 1326, Commitment Order, 2/10/17; *id. at* 1327, Mins., 2/10/17.

[19] St. R. Vol. 9 of 10, at 2150-2226, La. Sup. Ct. Writ Application, 17 K 432, 3/9/17; St. R. Vol. 10 of 10, at 2286-2330, La. Sup. Ct. Writ Application, 17 KO 617, 4/12/17.

[20] *State v. Luckey*, 228 So. 3d 1225 (La. 10/27/17); *State v. Luckey*, 228 So. 3d 1234 (La. 10/27/17); St. R. Vol. 9 of 10, at 2148, La. Sup. Ct. Order, 2017-K-0432, 10/27/17; *id. at* 2149, La. Sup. Ct. Order, 2017-KO-0617, 10/27/17.

[21] St. R. Vol. 5 of 10, at 1348-1404, Application for Post-Conviction Relief, 8/16/18; St R. Vol. 6 of 10, at 1405-90, Application for Post-Conviction Relief (con't), 8/16/18.

(4) ineffective assistance of appellate counsel for failing to raise insufficiency of the evidence on appeal.[22]

He also filed a motion for production of documents requesting that he be provided the transcript of the motion *in limine* hearing and the trial transcripts, including opening statements and closing arguments.[23]

On August 20, 2018, the trial court denied Luckey's motion requesting free copies of transcripts, finding that he had not shown a particularized need for the transcripts.[24] On October 2, 2018, the trial court denied Luckey's application for post-conviction relief.[25] The trial court found that Luckey's first claim was procedurally barred by LA. CODE CRIM. PROC. art. 930.4(A) as it was fully litigated on direct appeal.[26] The trial court found the portion of the second claim alleging violation of his right to confrontation as to admission of the redacted interview of E.D. procedurally barred by LA. CODE CRIM. PROC. art. 930.4(B) for failure to raise the issue in the proceeding leading to the conviction.[27] The trial court found that second part of claim two alleging violation of state statutory requirements under La. Rev. Stat. § 15:440.5(A)(3) was fully addressed on appeal and therefore procedurally barred under LA. CODE CRIM. PROC. art. 930.4(A).[28] As for Luckey's claim of ineffective assistance of counsel for failure to object to the admission of the redacted interview, the trial court found that he failed to show a different strategy would have resulted in exclusion of the Children's Advocacy Center tape.[29] The trial court found that Luckey's

---

[22] St. R. Vol. 5 of 10, at 1352-55, Application for Post-Conviction Relief, 8/16/18.
[23] *Id.* at 1344-46, Motion for Production of Documents, 8/16/18.
[24] St. R. Vol. 6 of 10, at 1491, Order, 8/20/18.
[25] *Id.* at 1513-15, Order, 10/2/18.
[26] *Id. at* 1513.
[27] *Id.*
[28] *Id.*
[29] *Id. at* 1513-14.

claim of ineffective assistance of counsel at sentencing was not cognizable under *State v. Melinie*[30] and LA. CODE CRIM. PROC. art. 930.3.[31]   The trial court rejected Luckey's claim that he had been offered a plea and, crediting the prosecutor's affidavit swearing that the State did not offer a five-year deal, found that there was no plea offer.[32]   Finally, the trial court found that Luckey failed to meet his burden under LA. CODE CRIM. PROC. art. 930.2 with regard to his claim of ineffective assistance of appellate counsel.[33]

On December 6, 2018, Luckey filed a writ application to the Louisiana Fifth Circuit Court of Appeal.[34]   On February 12, 2019, the Louisiana Fifth Circuit denied Luckey's writ application.[35] The court found claim one was procedurally barred as it was fully litigated on appeal.[36]   The court found that the first part of claim two procedurally barred as repetitive and that the second part procedurally barred for failure to raise the issue in the proceeding leading to the conviction.[37]   The court agreed with the trial court's determination that Luckey's claims of ineffective assistance of counsel were procedurally barred or without merit.[38]   The Louisiana Fifth Circuit Court found that

---

[30] 665 So. 2d 1172 (La. 1/12/96).  The Court recognizes that, after the rulings by the state district court and the Louisiana Fifth Circuit, in *State v. Harris*, --- So. 3d ----, 2020 WL 3867207 (La. 7/9/20), the Louisiana Supreme Court made an exception to *Melinie* specifically for Harris and found his claim of ineffective assistance of counsel at sentencing to be cognizable on collateral review.  The Louisiana Supreme Court did not address whether *Harris* is retroactive.  To the extent that Luckey claims that the state courts erred in applying *Melinie*, a federal habeas court does not sit to correct errors made by state courts in interpreting and applying state law.  *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68).  For this reason, it is not within the federal court's province to disagree with the application of the bar; it is only to determine its adequacy.  *Lee v. Cain*, No. 03-2626, 2004 WL 2984274, at *1 n.2 (E.D. La. Dec. 6, 2004) (Vance, J.) (addressing La. Code Crim. P. art. 930.3).  Because Luckey's petition is untimely, the Court need not determine whether the state courts' reasoning was independent and adequate to bar review of Luckey's claim of ineffective assistance of counsel at sentencing.

[31] *Id. at* 1514.

[32] *Id.*

[33] *Id. at* 1514-15.

[34] St. R. Vol. 8 of 10, at 1982-2139, La. 5th Cir. Writ Application, 18-KH-721, 12/18/18.

[35] *Id*. at 2140-47, La. 5th Cir. Order, 18-KH-721, 2/12/19.

[36] *Id. at* 2141.

[37] *Id. at* 2142-43 (citing LA. CODE CRIM. PROC. arts. 930.4(A) and (B).

[38] *Id. at* 2143-45.

Luckey failed to meet his burden of proving ineffective assistance of appellate counsel for failing to raise sufficiency of the evidence on appeal.[39]  The court held that the trial court did not err in finding Luckey had not shown a particularized need for the documents requested.[40]  Finally, the court found "no error in the district court's denial of relator's application for post-conviction relief."[41]

On January 26, 2021, Luckey filed a writ application and stay request with the Louisiana Supreme Court.[42]  On August 6, 2021, the Louisiana Supreme Court denied the writ application, finding it to be untimely filed pursuant to La. S. Ct. R. X § 5(a).[43]  On August 20, 2021, Luckey requested rehearing, claiming that he did not receive the Louisiana Fifth Circuit's February 12, 2019, ruling until December 2, 2020, and that he filed his related writ application within the time he had access to the law library due to "COVID-19 Quarantine/Lockdown protocol."[44]  The Louisiana Supreme Court denied Luckey's application for rehearing on November 17, 2021.[45]

## II.    FEDERAL HABEAS PETITION

On October 8, 2021, Luckey filed a petition for federal habeas corpus relief styled under 28 U.S.C. § 2254 and challenged his current custody.[46]  Luckey asserts the following claims before the court:

---

[39] *Id. at* 2145-46.

[40] *Id. at* 2146.

[41] *Id.*

[42] St. R. Vol. 10 of 10, 2331-35, La. Sup. Ct. Request for Stay, 1/26/21; *id.*, 2336-2540, La. Sup. Ct. Writ Application, 19 KH 1254, 1/26/21.

[43] *Luckey v. Tanner*, 322 So. 3d 246 (La. 8/6/21); St. R. Vol. 10 of 10, at 2541, La. Sup. Ct. Order, 2021-KH-00219, 8/6/21.

[44] St. R. Vol. 10 of 10, at 2542-68, Application for Rehearing, 21 KH 219, 10/5/21.

[45] *Luckey v. Tanner*, 327 So. 3d 508 (La. 11/17/21); St. R. Vol. 10 of 10, at 2569, La. Sup. Ct. Order, 2021-KH-00219, 11/17/21.

[46] ECF No. 1.

(1)    his rights to confrontation and due process were violated when the trial court allowed the victims to testify without conducting a competency hearing outside the presence of the jury;

(2)    he was denied the rights to present a defense, confrontation, and due process when the trial court allowed the State to present the redacted Children's Advocacy Center and related transcripts and prohibited the defense from cross-examining E.D. regarding her prior false allegations of sexual abuse against her uncle;

(3)    ineffective assistance of counsel when his trial counsel failed to: (a) properly object to the admission of the redacted audio and transcript of E.D.'s interview; (b) object to the victims' testimony on the bases of violation of confrontation and due process; (c) object to the sentence as excessive; and (d) advise Luckey that the State's five-year plea offer was in his best interest;

(4)    ineffective assistance of appellate counsel when his counsel failed to raise sufficiency of the evidence on appeal;

(5)    the trial court erred in denying Luckey's motion for production of documents;

(6)    the state courts erred in denying his application for post-conviction relief.[47]

The State filed a response in opposition to Luckey's petition and asserted: (1) that the petition was not timely filed; (2) that Luckey failed to exhaust claims three through six; and (3) claims one and two are procedurally defaulted.[48]  Luckey filed a reply claiming that he raised all of his claims at each level of the state courts and that he is entitled to equitable tolling.[49]

## III.    LAW AND ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28

---

[47] ECF No. 1, at 5-11; ECF No. 1-1, at 6-36.
[48] ECF No. 23, at 5-19.
[49] ECF No. 23, at 3-13.

U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996,[50] and applies to habeas petitions filed after that date.[51]  Luckey's petition is deemed filed on October 8, 2021.[52]

### A.    Preliminary Considerations

The two threshold questions in habeas review under the amended statute are (1) whether the petition is timely and (2) whether petitioner's claims were adjudicated on the merits in state court.  In other words, has the petitioner exhausted state court remedies and is the petitioner in "procedural default" on a claim.[53]  The State claims that Luckey's federal habeas petition was not timely filed because it was not filed within one year after finality of his conviction.[54]  The State also claims that Luckey failed to exhaust claims three through six in that he did not give the Louisiana Supreme Court a fair opportunity to adjudicate them.[55]  The State asserts that Luckey's claims are technically procedurally barred.[56]

For the reasons that follow, the State's limitations defense is supported by the record.  Luckey's petition was not timely filed under the AEDPA, and therefore, it should be dismissed with prejudice as time-barred.  Additionally, three of Luckey's claims are unexhausted and procedurally barred.

---

[50] The AEDPA was signed into law on that date and did not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 (5th Cir. 1992).

[51] *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).

[52] The Fifth Circuit has recognized the "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Luckey signed and dated his petition on October 8, 2021.  ECF No. 1, at 13; ECF No. 1-1, at 38.

[53] *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

[54] ECF No. 23, at 5-9.

[55] *Id.* at 9-15.

[56] *Id.* at 15-19.

B.    __AEDPA Statute of Limitations__

The AEDPA requires that a § 2254 petition must ordinarily be filed within one year of the date the conviction became final.[57]  Luckey's conviction was final on January 25, 2018, when he did not file an application for writ of certiorari with the United States Supreme Court within ninety (90) days after the Louisiana Supreme Court denied his post-appeal writ application on October 27, 2017.  Applying § 2244 literally, Luckey had one year from finality of his conviction, or until January 25, 2019, to file his federal habeas corpus petition.  Luckey did not file his federal habeas corpus petition within this one-year period.

Accordingly, his petition must be dismissed as untimely, unless the one-year statute of limitations was interrupted or otherwise tolled under one of the two ways recognized in the applicable law:  statutory tolling or equitable tolling.

### 1. Statutory Tolling

The AEDPA provides for suspension of its one-year limitations period:  "The time during which a *properly filed application for State post-conviction or other collateral review* with respect

---

[57] *Duncan v. Walker*, 533 U.S. 167, 179-80 (2001).  The statute of limitations provision of the AEDPA in 28 U.S.C. § 2244(d) provides for other triggers:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of--

A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;

C.    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Sections (d)(1)(B), (C) and (D) do not apply here.

14

to the pertinent judgment or claim is pending *shall not be counted* toward any period of limitation under this subsection."[58]  The Supreme Court has described this provision as a tolling statute.[59]

By its plain language, this provision does not create a new, full, one-year term within which a federal habeas petition may be filed at the conclusion of state court post-conviction proceedings.[60]  Rather, as the United States Fifth Circuit and other federal courts have held, because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending must merely be subtracted from the one-year limitations period:

> [Section] 2244(d)(2) provides that the period during which a properly filed state habeas application is pending must be excluded when calculating the one[-]year period.  Under the plain language of the statute, any time that passed between the time that [petitioner's] conviction became final and the time that his state application for habeas corpus was properly filed must be counted against the one year period of limitation.[61]

For a post-conviction application to be considered "properly filed" within the meaning of § 2244(d)(2), the applicant must "'conform with a state's applicable procedural filing requirements,'" such as timeliness and location of filing.[62]  The timeliness consideration in Louisiana, for purposes of the AEDPA, requires application of a prison mailbox rule to state pleadings filed *pro se* by a prisoner.[63]  I have applied that rule where necessary to Luckey's state court pleadings delineated in the procedural history.

---

[58] 28 U.S.C. § 2244(d)(2) (emphasis added).

[59] *Duncan*, 533 U.S. at 175-78.

[60] *Flanagan*, 154 F.3d at 199 n.1.

[61] *Id.*; *Brisbane v. Beshears*, 161 F.3d 1, 1998 WL 609926, at *1 (4th Cir. Aug. 27, 1998); *Gray v. Waters*, 26 F. Supp. 2d 771, 771-72 (D. Md. 1998).

[62] *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction application is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)"); *Williams v. Cain*, 217 F.3d 303, 306-307 n.4 (5th Cir. 2000) (quoting *Villegas v. Johnson*, 184 F.3d 467, 469 (5th Cir. 1999)); *Smith v. Ward*, 209 F.3d 383, 384-85 (5th Cir. 2000).

[63] *Causey v. Cain*, 450 F.3d 601, 604-05 (5th Cir. 2006).

A matter is "pending" for § 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.'"[64]  The phrase "other collateral review" in the statute refers to state court proceedings challenging the pertinent judgment subsequently challenged in the federal habeas petition.[65]  A "pertinent judgment or claim" requires that the state court filings for which tolling is sought must have challenged the same conviction being challenged in the federal habeas corpus petition and must have addressed the same substantive claims being raised in the federal habeas corpus petition.[66]

As calculated in the first manner above, Luckey's conviction was final under federal law on January 25, 2018, when he did not file a writ application with the United States Supreme Court after the Louisiana Supreme Court denied his related writ applications.[67]  The AEDPA limitations period began to run the next day, January 26, 2018, and continued without interruption for 199 days until Luckey filed his application for state post-conviction on August 13, 2018.  Thus, statutory tolling began on August 13, 2018.  Statutory tolling continued during the time his "properly filed" application remained "pending" in the state district court, that is, until relief was denied on October 2, 2018.  Thereafter, state post-conviction proceedings remained "pending" before the Louisiana Fifth Circuit when Luckey properly filed his writ application which was denied by the Louisiana Fifth Circuit on February 12, 2019.[68]

---

[64] *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *Williams*, 217 F.3d at 310 (a matter is "pending" for § 2244(d)(2) purposes until "'further appellate review [is] unavailable under [Louisiana's] procedures.'")
[65] *Dillworth v. Johnson*, 215 F.3d 497, 501 (5th Cir. 2000) (state habeas petition challenging a prior conviction in one county was other collateral review even though filed as a challenge to a second conviction in a different county); *Nara v. Frank*, No. 99-3364, 2001 WL 995164, at *5 (3d Cir. Aug. 30, 2001) (motion to withdraw a guilty plea is "other collateral review").
[66] *Godfrey v. Dretke*, 396 F.3d 681, 686-88 (5th Cir. 2005).
[67] *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (time for filing for certiorari with the U.S. Supreme Court is included in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. Rule 13(1).
[68] The State incorrectly argues that Luckey's writ application was untimely as it was filed more than thirty (30) days after the trial court denied relief.  *See* ECF No. 23, p. 7.  The trial court, however, extended the filing date for Luckey's writ application return to December 14, 2018.  St. R. Vol. 6 of 10, at 1528, Order,

Luckey's limitations began to run again on March 14, 2019, when he did not timely file a writ application to the Louisiana Supreme Court.[69]  At that point, he had one hundred and sixty-six (166) days remaining.  While Luckey submitted a writ application to the Louisiana Supreme Court on January 26, 2021, his application was not "properly filed" because it was untimely pursuant to La. S. Ct. R. X § 5 and could not be "pending" as post-conviction review for purposes of the AEDPA's statute of limitations and tolling doctrines.[70]  His application for rehearing also did not toll the limitations period.[71]  The AEDPA time limitation thus expired on August 27, 2019.

Luckey's federal petition is deemed filed on October 8, 2021, under the applicable mailbox rule.  This was seven hundred and seventy-three (773) days after the AEDPA one-year filing period expired on August 27, 2019.[72]  Accordingly, Luckey's federal petition was *not* timely filed and must be dismissed with prejudice for that reason.

---

10/30/2018.  Luckey mailed his related writ application on December 8, 2018, six days prior to the set deadline.  St. Cr. Vol. 8 of 10, at 2139, La. 5th Cir. Writ Application, 18-KH-721, 12/18/18.

[69] *See Grillette v. Warden, Winn Correctional Center*, 372 F.3d 765, 769-71 (5th Cir. 2004) (a state application ceases to be pending when the time for supervisory review expires); *Allen v. Vannoy*, No. 18-8464, 2019 WL 2077007, at *4 (E.D. La. Mar. 22, 2019) ("it is abundantly clear that a federal habeas petitioner in fact receives *no tolling credit whatsoever* for an untimely Louisiana Supreme Court writ application.") (citations omitted), *R&R adopted*, 2019 WL 2076690 (E.D. La. May 10, 2019), *certificate of appealability denied*, No. 19-30393, 2020 WL 6580031 (5th Cir. Feb. 18, 2020), *cert. denied*, 141 S. Ct. 144 (2020); *Romero v. Cain*, 6:14-cv-1164, 2015 WL 237166, at *5 (W.D. La. Jan. 16, 2015) ("Statutory tolling under § 2244(d)(2) ceased, at the latest, on July 27, 2013 when petitioner failed to meet the Rule X, § 5(a) thirty-day deadline to seek the next level of post-conviction review in a proper and timely fashion, which rendered his application no longer 'pending.'") (citation omitted).

[70] *Williams v. Cain*, 217 F.3d 303, 309-11 (5th Cir. 2000) (writ application that failed to comply with Rule X § 5 was not "properly filed" and did not toll the time limitation); *accord Boston v. Stinson*, No. 16-3643, 2016 WL 7735222, at *6 (E.D. La. Oct. 26, 2016), *R&R adopted*, 2017 WL 117893 (E.D. La. Jan. 11, 2017); *see also Jenkins v. Cooper*, No. 07-0216, 2009 WL 1870874, *5 (E.D. La. June 26, 2009) (holding that a petitioner does not benefit from any statutory tolling for an untimely writ application filed in the Louisiana Supreme Court because "[a] writ application which fails to comply with La. Sup. Ct. Rule X 5(a) is not properly filed because it is untimely, and it is not pending post-conviction review for purposes of the . . . statute of limitations and tolling doctrines").

[71] *Gaudet v. Cain*, 31 F. App'x 835, 2002 WL 243278, at *1 (5th Cir. Jan. 18, 2002) (per curiam) (application for rehearing did not toll the AEDPA time limitations period) (citing La S. Ct. R. X, § 5(a), LA. APP. R. 2-18.7 and *Y.F.B. v. R.D.R.*, 787 So. 2d 276 (La. 4/12/101)).

[72] Luckey did not specifically address timeliness in his habeas petition.  In addressing exhaustion, however, he inexplicably claims that "10 months and 1 day" had run and that he had "60 days to perfect and file his

### 2.  No Equitable Tolling Warranted

The United States Supreme Court has held that AEDPA's one-year statute of limitations period in § 2244(d)(1) may be equitably tolled only when the petitioner has pursued his rights diligently and rare or extraordinary circumstances exist that prevented timely filing.[73]  Equitable tolling is warranted only in situations during which a petitioner was actively misled or prevented in some extraordinary way from asserting his rights.[74]  A petitioner bears the burden of proof to establish entitlement to equitable tolling.[75]

In response to the State's assertion of the statute of limitations in this case, Luckey claims that he is entitled to equitable tolling.[76]  His argument is two-fold.  Initially, he claims he did not receive the February 12, 2019 ruling of the Louisiana Fifth Circuit denying his writ application until December 1, 2020, "due to the fact that during this period of time the world was in a pandemic and the Court(s), basically shut down or had to be run from skeleton crews which caused a great delay in the process of receiving and filing decision."[77]  Second, he claims that the fifty-five (55) day lapse from when he received notice of the Louisiana Fifth Circuit decision until he signed his Louisiana Supreme Court writ application was due to COVID-19 lockdown with limited access to the law libraries for assistance or for research to prepare his writ application.[78]

---

application for Writ of Habeas Corpus, and this filing after the final judgment from the Louisiana Supreme Court, August 6, 2021, and the 14 days fro [sic] rehearing . . . ."  ECF No. 1-1 at 4.

[73] *Pace*, 544 U.S. at 418; *Jones v. Lumpkin*, 22 F.4th 486, 490 (5th Cir. Jan. 5, 2022) (citing *Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998)); *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999); *Cantu-Tzin v. Johnson*, 162 F.3d 295, 299 (5th Cir. 1998); *Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998).

[74] *Pace*, 544 U.S. at 418-19; *Cousin v. Lensing*, 310 F.3d 843, 848 (5th Cir. 2002).

[75] *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

[76] ECF No. 24, at 12-13.

[77] *Id. at* 10.

[78] *Id. at* 10-11.

Initially, a prisoner's *pro se* status does not constitute rare and exceptional circumstances warranting equitable tolling.[79]  In addition, the fact that Luckey has asserted ineffective assistance of trial counsel does not excuse his untimely federal filing.  The United States Supreme Court's holdings in *Martinez v. Ryan*,[80] and *Trevino v. Thaler*[81]*,* and their progeny, simply do not provide a basis for review of Luckey's untimely filed federal petition.

In *Martinez v. Ryan*, the Court held that a state-imposed "*procedural default* will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at <u>trial</u> if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."[82]  In *Trevino v. Thaler*, the Supreme Court held that *Martinez* applies where "the [state] procedural system — as a matter of its structure, design, and operation — does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal."[83]  In this case, however, the bar at issue arises from Luckey's failure to meet the *federal* limitations deadline under the AEDPA, not any state procedural rule.  The *Martinez* and *Trevino* opinions also do not constitute new rules of constitutional law made retroactive on collateral review that would start a new one-year filing period under the AEDPA.[84]

---

[79] *See, e.g.*, *United States v. Petty*, 530 F.3d 361, 365 (5th Cir. 2008) ("Proceeding pro se is alone insufficient to equitably toll the AEDPA statute of limitations."); *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000) ("[P]roceeding pro se is not a 'rare and exceptional' circumstance [warranting equitable tolling] because it is typical of those bringing a § 2254 claim."); *Turner v. Johnson*, 177 F.3d 390, 392 (5th Cir. 1999) ("[N]either a plaintiff's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling.").

[80] 566 U.S. 1 (2012).

[81] 569 U.S. 413 (2013).

[82] 566 U.S. at 17 (emphasis added).

[83] 569 U.S. at 1921.

[84] *See In re Paredes*, 587 F. App'x 805, 813 5th Cir. 2014) ("the Supreme Court has not made either *Martinez* or *Trevino* retroactive to cases on collateral review, within the meaning of 28 U.S.C. § 2244."); *Adams v. Thaler*, 679 F.3d 312, 322 n.6 (5th Cir. 2012).

Thus, neither *Martinez* nor *Trevino* excuses Luckey's untimely filing of his federal habeas petition.[85]

As indicated, Luckey claims that he did not receive the Louisiana Fifth Circuit order of February 12, 2019, denying his writ application until December 1, 2020.[86]  Luckey provided a copy of a prison mail log with a handwritten notation indicating that the only legal mail he received from the Louisiana Fifth Circuit Court of Appeal in 2019 was mail received on January 25, 2019.[87]

In his reply brief, Luckey states that, due to the stoppage of legal assistance at the prison, he was unable to file his Louisiana Supreme Court writ application within thirty days after he received notice of the Louisiana Fifth Circuit decision.[88]  However, the purpose of the federal equitable tolling doctrine relates to the suspension of the federal limitations period under the AEDPA, not state law filing deadlines for state court pleadings.[89]  Nevertheless, to the extent that Luckey's pleas to excuse his tardiness in state court filings similarly led to his tardiness in federal court, he has not established a basis for granting the extraordinary remedy of equitable tolling of the AEDPA's one-year filing period.

"A state-created delay in sending a court opinion to a petitioner may constitute an extraordinary circumstance."[90]  Luckey's failure to receive notice of the Louisiana Fifth Circuit ruling for nearly twenty-two (22) months could in fact qualify as an "extraordinary

---

[85] *See Arthur v. Thomas*, 739 F.3d 611, 631 (11th Cir. 2014) ("Thus, we also hold that the reasoning of the *Martinez* rule does not apply to AEDPA's limitations period in § 2254 cases or any potential tolling of that period."); *Smith v. Rogers*, No. 14-0482, 2014 WL 2972884, at * 1 (W.D. La. Jul. 2, 2014); *Falls v. Cain*, No. 13-5091, 2014 WL 2702380, at *3 (E.D. La. Jun. 13, 2014) (Order adopting Report).
[86] ECF No. 1-1, p. 3.
[87] ECF No. 1-2, at 75; ECF No. 24-3, at 51.
[88] ECF No. 24, at 10-12.
[89] *See Pace*, 544 U.S. at 419; *Davis*, 158 F.3d at 811.
[90] *Diggs v. Vannoy*, 840 F. App'x 779, 781 (5th Cir.) (citing *Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000)), *cert. denied*, 142 S.Ct. 153 (2021).

circumstances."[91]  Nevertheless, even so, that is only half of Luckey's battle; as noted, he must also establish that he pursued his rights *diligently*, because "[e]quity is not intended for those who sleep on their rights."[92]

The Fifth Circuit recognizes that "equitable tolling" by its definition suspends the limitations period when, "despite diligent efforts," the petitioner "did not discover the injury until *after the limitations* period had expired."[93]  Regarding the diligence requirement, it is clear that a petitioner need not show that he exercised the "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is *reasonable* diligence."[94]  "What a petitioner did both before and after the extraordinary circumstances that prevented him from timely filing may indicate whether he was diligent overall."[95]  Thus, courts consider a prisoner's diligence at three stages: (1) the time after petitioner's conviction became final until he filed his state post-conviction application; (2) the time during the pendency of his state post-conviction application; and (3) the time after petitioner learned that his request for state post-conviction relief was denied until he filed his federal habeas application.[96]  Luckey has not demonstrated that he exercised reasonable diligence at these three stages for the following reasons.

Initially, Luckey waited one hundred and ninety-nine (199) days from the date his convictions become final to file his state application for post-conviction relief.  In other words, he

---

[91] *See, e.g.*, *Jackson v. Davis*, 933 F.3d 408, 411 (5th Cir. 2019) (eighteen-month delay in receiving notice of the denial of state application by Texas Court of Criminal Appeal constituted extraordinary circumstances); *Williams v. Thaler*, 400 F. App'x 886, 892 (5th Cir. 2010) ("Our delayed notice cases demonstrate that the simple fact that a petitioner did not receive notice that the AEDPA limitations period had ceased to toll may be an extraordinary circumstance that warrants equitable tolling.") (citing *Phillips*, 216 F.3d at 511).

[92] *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) (quotation marks omitted).

[93] *Umana v. Davis*, 791 F. App'x 441, 443 (5th Cir. 2019) (quoting BLACK'S LAW DICTIONARY (11th ed. 2019)).

[94] *Holland*, 560 U.S. at 563 (emphasis added; quotation marks omitted).

[95] *Jackson*, 933 F.3d at 411 (citing *Pace*, 544 U.S. at 419; footnote omitted)

[96] *Id.* at 411-413.

allowed more than six months, approximately 55% of his one-year federal limitations period, to elapse before he even began seeking such relief.  Courts assessing similar delays in filing the state habeas petition have rejected equitable tolling.[97]

In addition, Luckey failed to diligently monitor the status of his Louisiana Fifth Circuit collateral review writ application.  The record reflects that, on December 8, 2018, Luckey filed a writ application with the Louisiana Fifth Circuit challenging the state district court's denial of relief.[98]  Luckey maintains that he did not receive the February 12, 2019 denial, and that he filed an application status check on October 21, 2019, ten months after he filed his writ application.[99] The record does not include a copy of that inquiry, nor did Luckey submit a copy to this Court. Luckey, however, submitted a faint copy of a form seeking withdrawal of funds for legal mail which appears to be dated October 21, 2019.[100]  Despite the fact that he apparently did not receive a response to that inquiry, Luckey inexplicably took *no further action* to check the status of his application until he sent another status inquiry by mail over a year later, on November 19, 2020.[101] Thus, nearly *two years* after he filed his writ application and nearly *thirteen months* after his initial inquiry went unanswered, Luckey again sought information about the status of his case.

While Luckey inquired regarding the status of his case two times, his decision to wait ten months to inquire about the status the first time and then another thirteen months after that

---

[97] *Stroman v. Davis*, 603 F.3d 299, 301-03 (5th Cir. 2010) (petitioner who filed state habeas petition after 215 days of AEDPA limitations had run did not show due diligence and was not entitled to equitable tolling); *accord Duran v. Davis*, No. 19-40628, 2020 WL 8020242, at *1 (5th Cir. Jul. 16, 2020) (petitioner who waited 216 days to file his state writ application was not entitled to equitable tolling); *Wesley v. Vannoy*, No. 19-141-BAJ-EWD, 2022 WL 989427, at *5 (M.D. La. Feb. 28, 2022) (petitioner who waited 190 days to file his post-conviction application after his appeal was final was dilatory and not entitled to equitable tolling), *R&R adopted*, 2022 WL 988370 (M.D. La. Mar. 31, 2022).

[98] St. R. Vol. 8 of 10, at 1982-2139, La. 5th Cir. Writ Application, 18-KH-721, 12/18/18.

[99] St. R. Vol. 10 of 10, at 2546, Application for Rehearing, 21 KH 219, 8/20/21.

[100] ECF No. 24-3, at 54.

[101] St. R. Vol. 10 of 10, at 2526, Letter from Louisiana Fifth Circuit Court of Appeal, 11/30/20.

unanswered inquiry to inquire about the status for a second time was an unreasonable delay.[102]
Luckey's lack of diligence in monitoring the status of his writ application precludes equitable
tolling.[103]

Then, after he learned of the intermediate appellate court judgment, Luckey failed to pursue
his remedies with diligence and alacrity.  He waited fifty-five (55) days to file his writ application
with the Louisiana Supreme Court.  Luckey claims, as he did in his unsuccessful request for
rehearing to the Louisiana Supreme Court, that his related writ application was late due to limited
access to the law library during COVID-19 lockdown.[104]  Luckey, however, provides no specific
dates when he was in lockdown or when he personally was denied access to the law library as a
result of pandemic procedures.  In his request for rehearing, Luckey admitted that he had at least
some access to the prison law library as he claimed that he filed his writ application "within the
time period [he] had access to the Law Library and was able to work on Legal Proceedings."[105]
Luckey further provides no actual evidence that diminished library access *actually prevented* him

---

[102] *Licona v. Vannoy*, No. 19-10502, 2020 WL 4014842, at *1 (E.D. La. Jul. 15, 2020) (petitioner who
waited seven months before filing a status check and then another year before filing his second status check
was not entitled to equitable tolling), *appeal dismissed*, No. 20-30466, 2021 WL 3232598 (5th Cir. Feb.
18, 2021); *Smith v. Terrell*, No. 07-9449, 2009 WL 2139697, at *4 (E.D. La. July 13, 2009) (lack of due
diligence where petitioner waited a year after his initial inquiry to the Louisiana Supreme Court before
again checking on the status of his case); *McIntyre v. Davis*, EP-17-CV-163-DCG, 2018 WL 1041304, at
*4 (W.D. Tex. Feb. 22, 2018) (petitioner failed to show diligence where he waited six months to file his
state habeas application, and additional seven months to file a status request, and three additional months
to file his federal habeas petition); *Hicks v. Quarterman*, No. H-06-2208, 2007 WL 79706, at *5 (S.D. Tex.
Jan. 8, 2007) (lack of diligence where prisoner waited one year to make first inquiry about the status of a
filing and another year to make the second inquiry), *aff'd*, 298 F. App'x 346 (5th Cir. 2008); *Scott v. Dretke*,
No. 3:05-CV-0609-H, 2006 WL 1831331, at *3 (N.D. Tex. June 29, 2006) (lack of diligence where prisoner
waited ten months to inquire about the status of a filing); *Jones v. Cockrell*, No. Civ. A. 3:01-CV-0521M,
2002 WL 31298863, at *3 (N.D. Tex. Oct.8, 2002) (lack of diligence where prisoner waited approximately
one year to inquire about the status of a filing).
[103] *Stroman*, 603 F.3d at 302 (affirming district court's denial of equitable tolling where prisoner did not
make a second inquiry about the status of his state habeas petition for eighteen months).
[104] ECF No. 24, at 10-11.
[105] St. R. Vol. 10 of 10, at 2544, Application for Reconsideration, 21 KH 219, 10/5/21.

from timely filing his writ application.[106]  The writ application he filed before the Louisiana Supreme Court is, in large part, verbatim of the writ application that he filed with the Louisiana Fifth Circuit nearly two years earlier.[107]  Additionally, intermittent lockdowns do not constitute "extraordinary circumstances" warranting equitable tolling.[108]  Nor is the mere existence of the COVID-19 pandemic, without more, an "extraordinary circumstance."[109]  In fact, one court has found that a prisoner had not shown extraordinary circumstances when "his circumstances were not different than any other prisoner attempting to access legal resources, as they all were subject to COVID-19 protocols."[110]  Further, where, as here, a prisoner fails to show he was diligently pursuing his right before the pandemic restricted his access to the law library, he is not entitled to equitable tolling.[111]

Luckey has also not shown reasonable diligence under the circumstances at the third stage. When the state post-conviction proceedings were concluded on August 6, 2021, Luckey

---

[106] *Krause v. Thaler*, 637 F.3d 558, 56162 (5th Cir. 2011); *accord United States v. Hall,* No. 16-68, 2021 WL 4989884, at *4 (E.D. La. Oct. 27, 2021) (petitioner was not entitled to equitable tolling for § 2255 motion where he did not explain why the pandemic prevented him from timely filing); *United States v. Pizarro*, No. 16-63, 2021 WL 76405, at *2 (E.D. La. Jan. 8, 2021) (denying equitable tolling where petitioner presented no evidence that any diminished library access due to COVID-19 lockdowns actually prevented him from filing § 2255 petition); *Ramos v. Lumpkin*, No. SA-20-CA-01448-FB, 2021 WL 3410314, at *3 (W.D Tex. Aug. 4, 2021) (no evidence that diminished library access due to COVID-19 prevented petitioner from filing federal petition).

[107] *Compare* St. R. Vol. 10 of 10, 2336-2366, La. Sup. Ct. Writ Application, 19 KH 1254, 1/26/21 *with* St. R. Vol. 8 of 10, at 1982-2007, La. 5th Cir. Writ Application, 18-KH-721, 12/18/18.

[108] *Tate v. Parker*, 439 F. App'x 375, 376 (5th Cir. 2011) (temporary denial of access to research materials or the law library is not sufficient to warrant equitable tolling).

[109] *See, e.g.*, *United States v. Clay*, No. 2:20-236, 2021 WL 2018996, at *3 (S.D. Tex. May 18, 2021); *Hines v. United States*, No. 20-CV-10064 (CS), No. 17-CR-364-2 (CS), 2021 WL 2456679, at *2 (S.D.N.Y. June 16, 2021).

[110] *Rush v. Secretary, Florida Department of Corrections,* No. 21-10218-C, 2021 WL 3134763, at *1 (11th Cir. June 22, 2021) (denying certificate of appealability to appeal the dismissal of his habeas petition as untimely).

[111] *Hall,* 2021 WL 4989884, at *3 (petitioner was not entitled to equitable tolling for § 2255 motion); *Ferrell v. Lumpkin*, No. SA-21-CA-0420-FB, 2021 WL 4340971, at *3 (W. D. Tex. Sept. 23, 2021) ("prisoners are not entitled to equitable tolling if there is no evidence that they diligently pursued their right to file a petition prior to the lockdowns") (citations omitted), *appeal filed*, No. 21-51003 (5th Cir. Oct. 21, 2021).

nevertheless waited over two additional months to file his federal application.[112]  He provides no

reason why he did so.  "Unexplained delays do not evince due diligence or rare and extraordinary

circumstances."[113]

Viewing Luckey's actions at each stage, Luckey has failed to establish that he acted with

reasonable diligence.  Luckey, therefore, is not entitled to equitable tolling of the one-year AEDPA

filing period.

### 3. Actual Innocence

A petitioner can overcome the one-year statute of limitations imposed by the AEDPA if he

can establish "actual innocence."  In *McQuiggin v. Perkins*, the Supreme Court held that "actual

innocence, if proved, serves as a gateway through which a petitioner may pass whether the

impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations."[114]

The Court allows this exception to prevent a "fundamental miscarriage of justice."[115]  However,

the Court cautions that "tenable actual innocence gateways are rare: '[A] petitioner does not meet

---

[112] *Duran*, 2020 WL 8020242, at *1 (petitioner was not entitled to equitable tolling when he waited seven months to file his state habeas application and ten weeks after receiving the state court's decision to file his federal habeas application); *Derouselle v. Cain*, 279 F. App'x 320, 321 (5th Cir. 2008) (affirming denial of equitable tolling for lack of due diligence where petitioner waited two months after state post-conviction proceedings were completed to file habeas petition); *Gordon v. Quarterman*, 236 F. App'x 975, 976-77 (5th Cir. 2007) (same); *Simmons v. Johnson*, 210 F.3d 368, 2000 WL 293959, at *1 (5th Cir, Feb. 17, 2000) (district court did not abuse its discretion in finding equitable tolling not warranted where petitioner waited more than one month after receiving notice of denial of his state post-conviction application to file his habeas petition); *Wesley*, 2022 WL 989427, at *5 (petitioner's fifty-four (54) day delay in filing his habeas petition after he received delayed notice that the Louisiana Supreme Court had denied his writ application failed to act with reasonable diligence and was not entitled to equitable tolling).

[113] *George v. Vannoy*, No. 6:17-CV-01614, 2018 WL 1698308 (W.D. La. Mar. 6, 2018) (lack of due diligence where petitioner waited fifty-three (53) days after the denial of his state application to file his habeas petition), *R&R adopted*, 2018 WL 1661457 (W.D. La. Apr. 5, 2018).

[114] 569 U.S. 383, 386 (2013).

[115] *Id.* at 392.

the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"[116]

Luckey does not invoke *McQuiggin* nor does he make the required showing.  As the United States Supreme Court has explained: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.  Because such evidence is unavailable in the vast majority of cases, claims of actual innocence are rarely successful"[117] and thus rejected "in virtually every case."[118]

Here, Luckey has not met the rigorous burden of proof imposed under the actual innocence exception.  The only "new" evidence Luckey presents is evidence that was excluded by the trial court.  That evidence relates to E.D.'s allegations of sexual abuse against her uncle when she was five years old.

Luckey provided a copy of an incident report from the St. Tammy Parish Sheriff's Office relating to the April 2011 investigation of the victim's uncle ("J.J.") for an incident regarding behavior with the victim.[119]  The report includes detailed information about alleged sexual encounters between the victim and her uncle and recounts an interview of E.D. at the Children's Advocacy Center in Covington in April 2011.[120]  E.D. made statements, using her own terminology, that her uncle touched her on both her vaginal and buttocks areas and that she and her uncle had both vaginal and oral sexual intercourse.[121]  E.D. described watching pornographic

---

[116] *Id.* at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

[117] *Schlup*, 513 U.S. at 324.

[118] *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (citation omitted).

[119] ECF No. 1-4, at 50-82.

[120] *Id.* at 53, 57-59, 79, 81.

[121] *Id.* at 53, 57-59.

movies with her uncle, and claimed that he allowed her to bring a movie home but explained that her mother threw the movie out.[122]  E.D. stated that her uncle told her not to tell anyone about the incidents.[123]  E.D.'s mother, B.B., told detectives that, after she found E.D. with the pornographic DVD, E.D. described instances of oral sexual intercourse with her uncle.[124]

A search of J.J.'s home pursuant to a warrant revealed a pornographic DVD.[125]  During an interview, J.J. denied doing anything inappropriate with E.D., but stated that he needed help.[126]  Months later, after a forensic analysis of computers seized from J.J.'s home revealed nothing of evidentiary value, the investigating detective inactivated the case pending any future disclosures of E.D. or the location of further evidence.[127]

During her February 18, 2013, interview at the Children's Advocacy Center with Dr. Jackson, E.D., who was seven years old, disclosed that her Uncle J.J. tried to put his "bird" in her mouth, but that she kicked him in the face.[128]  E.D. recalled that this occurred every time she spent the night at her uncle's house in Slidell and that his "bird" was "old and wrinkly."[129]  E.D. explained that on one occasion she tried to call her mother to pick her up from her uncle's home, but that he took the phone away and she had to spend the whole night.[130]  E.D. explained that the events occurred in her aunt and uncle's room when her aunt was at work.[131]  E.D. denied anything else happening with her uncle.[132]  She specifically denied anything happening with his mouth,

---

[122] *Id.* at 58-59.
[123] *Id.* at 59.
[124] *Id.* at 53, 57, 60.
[125] *Id. at* 63.
[126] *Id. at* 64-65.
[127] *Id. at* 65-66, 75.
[128] *Id. at* 3, 18, 20, 25.
[129] *Id. at* 20.
[130] *Id.*
[131] *Id. at* 21, 26.
[132] *Id. at* 25.

hands or fingers.[133]  E.D. recalled that her uncle told her to keep what happened between them a secret, but that she eventually told her mom.[134]

On February 20, 2013, the St. Tammany Sheriff's Department, after reviewing the transcript of E.D.'s interview with Dr. Jackson and comparing E.D.'s statements to those made during her interview in April 2011, found E.D.'s statements of sexual abuse by her uncle to be inconsistent and closed the 2011 case.[135]

The fact that E.D. made inconsistent statements of sexual abuse by her uncle and the St. Tammany Parish Sheriff's Office closed its investigation of J.J. does not establish Luckey's factual innocence.  Notably, on appeal, the Louisiana Fifth Circuit found that "the State presented a very strong case, including the victims' trial testimony, photographic evidence corroborating one of the victim's stories, and the testimony of the State's expert in child abuse pediatrics and delayed disclosure who testified that, in her opinion, E.D. and A.B. had been sexually abused."[136]  Further, it is possible that evidence relating to E.D.'s previous allegations would have been more damaging to Luckey's case.  At the hearing regarding the State's motion *in limine* to exclude evidence relating to E.D.'s previous allegations against her uncle, the trial court viewed the videos of the two interviews of E.D., and specifically found:

> I believe that reasonable jurors if they viewed the video that I viewed and the audio that I listened to, I don't believe the jurors would find that those allegations were false.
>
> In fact, after watching those videos, I think that they would have more compassion for the victim and that it wouldn't be in your client's best interest for them to view those.[137]

---

[133] *Id. at* 25-26.
[134] *Id. at* 22-23.
[135] *Id. at* 76-82.
[136] *Luckey*, 212 So. 3d at 1230; St. R. Vol. 8 of 10, at 1951-52, 5th Cir. Opinion, 16-KA-494, 2/8/17.
[137] St. R. Vol. 2 of 10, at 272-73, Motion *in Limine* Hearing Transcript, 10/1/14.

Regardless, again, the fact that E.D.'s statement about the nature of the sexual abuse by her uncle made when she was five years old was inconsistent with the statement she made when she was seven years old does not prove Luckey's innocence in this case. Dr. Jackson testified at trial that "many times in children there might be some inconsistences in between whoever may have first talked to the child or the second or third or fourth or fifth down the road. Often there's a lot of different factors that come into that as well."[138] She explained that it was not uncommon for there to be inconsistencies in statements when a child speaks to multiple people.[139] Dr. Jackson explained that it was difficult for anyone to talk about something to do with their private parts and that "a lot of people often will skip parts, not talk about everything."[140] For these reasons, Luckey does not make the showing demanded under *McQuiggin* to establish that no reasonable juror would have found him guilty beyond a reasonable doubt after considering the evidence related to E.D.'s allegations against her uncle.

Luckey has asserted no other excuse to avoid the expiration of the AEDPA limitations period. His federal petition, deemed filed October 8, 2021, was not timely filed and must be dismissed with prejudice for that reason.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Joshua Luckey's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days

---

[138] St. R. Vol. 2 of 10, at 479, Trial Transcript, 11/12/14.
[139] *Id. at* 480.
[140] St. R. Vol. 2 of 10, at 507, Trial Transcript, 11/13/14.

after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[141]

New Orleans, Louisiana, this _____9th_____ day of June, 2022.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[141] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (citing 28 U.S.C. § 636(b)(1)). *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).